[Civ. No. 4644.   Fourth Dist.   June 11, 1953.]

VINCENT JOSEPH JURA et al., Appellants, v. SUNSHINE
BISCUITS, INC. (a Corporation), Respondent.

Meux & Gallagher for Appellants.

David E. Peckinpah, Denver C. Peckinpah and Charles F.
Hamlin for Respondent.

MUSSELL, J.—This is an action on contract to recover the purchase price for figs and fig paste sold by plaintiffs and appellants (who were fig growers and producers of sliced figs and fig paste) to defendant and respondent Sunshine Biscuits, Inc., a corporation, engaged in the business of manufacturing crackers and cookies. In a letter to defendant company, dated March 7, 1947, Jura Farms offered to sell its 1947 crop of figs, estimated at 800 tons, to defendant at a price computed by adding to the average sweat box price paid to growers for the 1947 crop of Adriatic figs, plaintiffs' actual cost of processing said figs, plus a profit of one cent per pound for processing, less 2½ per cent brokerage discount. On March 31, 1947, defendant replied to this letter, stating, among other matters, ''It will be in order for you to book 800 tons of Adriatic figs for our account this coming season on the basis outlined in your letter.''

Plaintiffs allege that pursuant to this agreement the Jura-Packing Company, between the 12th day of January, 1948, and the 6th day of August, 1948, delivered to defendant 800 tons of fig paste and sliced figs of the 1947 crop and defendant paid to plaintiffs the sum of $121,568; that the average sweat box price paid to growers for the 1947 crop of figs was 7¾ cents per pound; that the actual process cost was 4 cents per pound; that the total price defendant agreed to pay for said figs was the sum of $204,000, leaving a balance due of $82,432.

Defendant, in its answer, denied that the exchange of letters in March, 1947, constituted an agreement; admitted delivery of the 800 tons of figs referred to in the letters and denied that any of said merchandise was delivered pursuant to the alleged contract of March 31, 1947. Affirmative defenses were also set up in the answer: (1) that prior to the delivery of any merchandise under the terms of the March 31, 1947, written contract, the parties thereto voluntarily entered into an oral agreement to alter and modify the original obligation between them, with intent to extinguish the old obligation and that such oral agreement was fully executed; (2) that the parties entered into an oral agreement to substitute a new obligation between them with the intent to extinguish the old obligation and that such oral agreement was fully executed; (3) that on or about January 1, 1948, appellants orally agreed to accept as full accord and satisfaction of their claims under said contract a different price for said figs and fig paste than as provided in the exchange of letters of March, 1947, and that such oral agreement was fully executed. De-

fendant also pleaded estoppel and that an account was stated between the parties.

The trial court found that on or about March 31, 1947, the parties entered into a written agreement wherein they agreed to the terms as stated by plaintiffs in their complaint; that plaintiffs never delivered any merchandise to defendant under or pursuant to the written agreement of March 31, 1947; that during the month of October, 1947, or thereabouts, and before any deliveries were made under the March, 1947, agreement, the parties thereto entered into an agreement terminating said contract by mutual consent; that at the time of such termination it was understood and agreed that the plaintiffs would thereafter sell to defendant such quantities of Adriatic fig paste and sliced figs from the 1947 crop as the defendant might order, the price to be agreed upon by the parties; that said parties did not at said time intend to enter into a binding contract for the sale and delivery of any merchandise; that from time to time thereafter and up to August 6, 1948, plaintiffs sold to defendant quantities of paste and sliced figs of the 1947 crop at prices then and there agreed upon by the parties; and that defendant paid in full the prices agreed upon. Plaintiffs appeal from the judgment for defendant which followed.

It is argued that the findings are not sustained by the evidence. This argument is without merit. There is no dispute as to the execution of the letters of March, 1947, the delivery and sale of 800 tons of merchandise and the payment of $121,568 therefor by defendant.

Concerning the terms of sale, Albert Simpson, head of the general purchasing department of defendant corporation, testified that nothing was done by the parties following the exchange of the March, 1947, letters until sometime in September of that year when Mr. Weatherford, plaintiffs' agent, called him by telephone and reported on the condition of the 1947 crop, stating that there was a tremendous crop in 1947, and as a result, the market price was "on the down side"; that Weatherford said "Simpson, Sunshine has to be protected on prices, regardless of the March letters." In a letter to defendant, dated December 27, 1947, Weatherford, in discussing the situation, stated that they were in a bad spot; that they would have to make the best of a bad situation and suggested that they get together on their own business; that profit was out and they had forgotten it entirely. After setting up cost figures, Weatherford stated "Well, this is our

cost figure, Mr. Simpson, just how far will you go along on this thing. We certainly would like to get the actual cost of packing out of it if it is possible to do so. We are sure that we can eventually work out some plan to supply you with figs that will be most advantageous to you as well as ourselves and we are not losing sight of these future plans for a moment.'' Mr. Simpson further testified that Mr. Weatherford called him by telephone several times, giving reports and asking for shipping instructions; that in these telephone conversations Weatherford stated ''We are going to take care of Sunshine—you are our account—forget all about the March arrangements. Profits are out the window''; that as a result of the telephone conversations and the December letters, a conference was held in New York in January, 1948. Mr. Weatherford, Mike Jura (one of the partners) and Simpson were present at this meeting. Mr. Weatherford there stated ''Simpson, we are here to work out a mutual arrangement on our figs''; that after being asked by Simpson what they would do on the price situation, Weatherford stated ''I would rather leave that in your hands. We have told you that you are our number one customer—and I have told you that we are going to take care of you on a competitive basis—you know more about the price situation on figs than we do''; that Simpson then stated that he was getting price quotations from the coast; that he felt that the figs set aside would be used but that he was not in a position to promise complete disposition of them but that he would be happy to work with them on such an arrangement; that Weatherford replied ''We want to go along with you on such an arrangement. We want to go along with you. Where you know the price, put them up to us and we will fill the orders.'' Simpson further testified that the contract of March, 1947, was abrogated and repealed and that Weatherford said ''Don't you worry, that March, 1947, contract is out.''

■ The testimony of Mr. Simpson is corroborated by evidence that plaintiffs accepted individual purchase orders for the 1947 fig crop, which orders contained price stipulations inconsistent with the March, 1947, agreement; that plaintiffs submitted invoices corresponding to defendant's individual purchase order prices rather than in accordance with the March contract; that at the time plaintiffs filed their complaint herein, no account receivable was set up on their books to indicate that any sum was due in connection with any of these deliveries; that defendant submitted and plaintiffs en-

dorsed voucher checks in payment for the merchandise listed on each of defendant's orders at the prices therein specified and each voucher contained the statement "If settlement as above is not satisfactory, return without alteration for correction"; that the final summary of shipments made and prices charged, which plaintiffs furnished defendant, contained no unsettled price problem; that plaintiffs paid a brokerage allowance to defendant based on the prices specified in defendant's purchase orders; that plaintiffs delayed making any claim for further payment from the time shipments were completed in August, 1948, to the time of the present action, which was filed on November 1, 1951.

The evidence was sufficient to support the trial court's findings that the parties terminated the agreement of March, 1947, by mutual consent and entered into a new agreement for the sale and delivery of the merchandise involved.

It is claimed by plaintiffs that the findings are contrary to any affirmative defense pleaded in the answer. ■ However, the answer contains a denial that the delivery of the merchandise was made pursuant to the agreement of March, 1947, and a denial that defendant agreed to pay the sum of $204,000 for the figs involved. It is alleged in the answer that prior to the delivery of figs or fig paste under the March agreement, the parties entered into an oral agreement to alter and modify the original contract; that this oral agreement was entered into voluntarily and in consideration of the mutually beneficial business relations between the parties; that the price to be paid for each shipment under the oral agreement was set by mutual agreement of the parties shortly before each particular shipment was made; that it was agreed that the prior written contract was to be extinguished by the new agreement; that the new agreement was fully executed by both parties; that plaintiffs orally agreed to accept as full accord and satisfaction of its claims under the March contract a different price for the merchandise involved than that provided in the written contract; that plaintiffs are estopped to deny the prices agreed upon, the invoices rendered and the acceptance of payment therefor; that the indebtedness evidenced by such invoices became accounts stated and were received as such and were paid in full by defendant; that defendant was not indebted to plaintiffs in any sum whatsoever. The pleadings on the part of defendant were sufficiently broad to present to the court the interpretation of the agreements of the parties. The findings are of ultimate facts

and within the issues presented by the pleadings. (*Central Heights Imp. Co.* v. *Memorial Parks, Inc.*, 40 Cal.App.2d 591, 610 [105 P.2d 596].)

It is next argued that, assuming that there was an oral agreement to terminate the contract of March 31, 1947, there was no valid consideration to support such an agreement. This argument is without merit. It is true, as plaintiffs contend, that there must be a consideration to extinguish the obligations created by a written contract, (*Sistrom* v. *Anderson*, 51 Cal.App.2d 213, 219 [124 P.2d 372]) but in the instant case the March, 1947, agreement was a bilateral contract which had not been performed by either side. Under the terms of the oral agreement plaintiffs were freed of their obligation to sell the 1947 crop to defendant and defendant was not obligated to buy it. ▆ As is stated in 6 Williston on Contracts, revised edition, page 5170:

"If the parties to a bilateral contract agree to rescind or modify it, there is no difficulty in regard to consideration, whether the agreement to rescind is made before or after a breach of the original contract, so long as neither party has completely performed or been discharged from his obligation. The promise of one party to forego his rights under the contract is sufficient consideration for the promise of the other party to forego his rights."

And in *Sass* v. *Hank*, 108 Cal.App.2d 207, 215 [238 P.2d 652], it is said:

"The mutual rescission or abrogation of a written contract may be effected by an oral agreement whether executed or not, in which event section 1698 of the Civil Code has no application. (*Grant* v. *Aerodraulics Co.*, 91 Cal.App.2d 68, 75 [204 P.2d 683].) It is true, as appellants assert, that such agreement must be supported by a sufficient consideration, but such consideration is present here in the form of the mutual cancellation of executory contractual rights. When such is the case each party has suffered a legal detriment in giving up such rights and the consideration is adequate. (*Grant* v. *Aerodraulics Co., supra*, p. 76; *Sistrom* v. *Anderson*, 51 Cal.App.2d 213, 219 [124 P.2d 372]; Rest. Contracts, sec. 406.)"

It is apparent from the record before us that plaintiffs considered the defendant their "number one customer" and were anxious to work out arrangements for the purchase of future

crops by the defendant. Plaintiffs state in their letter to defendant, dated December 27, 1947, ''your business means very much to us and we will go all out to hold it'' and ''we are sure that we can eventually work out some plan to supply you your figs that will be most advantageous to you as well as to ourselves and we are not losing sight of these future plans for one moment.'' The arrangement worked out at the January, 1948, conference was that defendant would purchase plaintiffs' figs on a competitive basis. Under the circumstances shown, it appears that there was sufficient consideration to support the oral agreement of the parties.

Finally, it is contended that Weatherford, the agent of plaintiffs, had no power to rescind or terminate the written contract of March, 1947. We cannot agree with this contention. As was said in *State Fin. Co.* v. *Hershel Calif. Fruit Prod. Co.*, 8 Cal.App.2d 524, 528 [47 P.2d 821]:

''The authority of the agent to modify a provision of a contract may be inferred from the evidence that he was empowered to do certain things, as in this case to change the parties to whom the money was to be paid. There is evidence in the record from which an inference may be drawn that the principal knew of the oral modification. There is no evidence to show that the modification was repudiated. Actual authority has been conferred upon the agent by the principal, and ostensibly this authority had been communicated to the interested third parties. (Civ. Code, secs. 2316 and 2317.) '. . . the extent of an agent's authority, and the ratification of an unauthorized act, may be proved by circumstantial evidence, as from the fact that the agent signed contracts, checks and generally managed the business of his principal. . . . The existence of an agency, like the extent of an agent's authority, is a question of fact.' (1 Cal.Jur., p. 696.)''

A finding that Weatherford was authorized to enter into the oral agreement binding the partnership is amply supported by the evidence. He was employed as manager of plaintiffs' packing plant and was in charge of the processing and sale of the figs and fig paste. He wrote practically all the correspondence and made all deals with prospective buyers. All of defendant's dealings with plaintiffs were with Weatherford or Mike Jura (deceased partner of plaintiffs). The agreement terminating the March, 1947, contract was ratified by Jura at the conference of the parties held in New York in January, 1948, and by the subsequent acts of plaintiffs in

supplying defendant with figs and fig paste at prices inconsistent with the exchange of letters of March, 1947.

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied July 6, 1953, and appellants' petition for a hearing by the Supreme Court was denied August 6, 1953.