[Civ. No. 54446. Second Dist., Div. Four. July 25, 1979.]

Estate of EDWARD DOLSON GEBERT, Deceased.
JOSEPH W. GEBERT et al., Plaintiffs and Respondents, v.
ROSEMARY M. GEBERT, Defendant and Appellant.

**COUNSEL**

Gerald H. B. Kane, Jr., for Defendant and Appellant.

Frederic S. Brown and Robert M. Kehn for Plaintiffs and Respondents.

---

**OPINION**

**JEFFERSON (Bernard), J.**—Plaintiffs (petitioners) Joseph W. and Roni Gebert, devisees and legatees under the will of Edward Dolson Gebert, brought an action against defendant (respondent) Rosemary M. Gebert pursuant to Probate Code section 851.5.[1] Petitioners claimed a half interest in certain real and personal property which had been held by Edward Gebert and his wife, Rosemary, respondent herein, in joint tenancy. Trial was by the court, sitting without a jury. Judgment was awarded in favor of petitioners. Respondent Rosemary prosecutes this appeal from the judgment.

I

*The Factual Background*

The record reveals that Edward (apparently called Dolson ordinarily) and Rosemary married in 1945. By 1975 they had acquired an estate of nearly $500,000, consisting of the 53-acre "Glory Ranch" in Santa Barbara County and substantial savings and shares in Insurance Securities Investments (I.S.I.). Legal title to the property in issue here—the ranch and a portion of the I.S.I. shares—was held by the Geberts in joint tenancy, although there was no evidence that either party consciously knew that they held these properties as joint tenants or knew the legal significance of such holding.

Sometime in 1974 the ranch was listed for sale. In July 1974, Rosemary divided $40,000 in savings with her husband and, in August 1974, petitioned for dissolution of the marriage.

---

[1]That section provides a means for determining title to property "[i]f a person dies in possession of, or holding title to, real or personal property which, or some interest in which, is claimed to belong to another, or dies having a claim to real or personal property, title to or possession of which is held by another, . . ."

Both Edward and Rosemary retained legal counsel to represent them in the dissolution proceedings. Neither counsel was aware that title to the property in issue here was held in joint tenancy, but treated the Gebert assets as if they were community property in the pleadings and negotiations.

The Geberts continued to reside on the ranch through 1974 and early 1975, although the atmosphere was acrimonious due to arguments over ranch income and property. Their lawyers attempted to negotiate a settlement concerning spousal support and Edward's insistence on continuing to live at the ranch.

By March 1975, Edward and Rosemary had nearly reached agreement by themselves concerning the disposition of various items of property, but nothing had been reduced to writing. On July 22, 1975, the couple again bargained between themselves concerning property disposition. The result was an agreement set down in writing by Rosemary. The first part of the writing consisted of two columns headed by "Dolson gets" and "Rosemary gets." Set forth in these columns were various items of personal property. This section was signed by both parties.

The second part of the writing, apparently executed after continuing discussion, stated: "Agree to send Dolson $200.00 out of ISI check for his personal expenses each month. When ranch is sold ISI acct to be closed & 1/2 to each of us. When ranch is sold 1/2 of proceeds goes to each of us. Dolson agrees to move off the ranch by July 28 & to remain off the property." This second part of the writing was followed also by the signature of the parties.

The document was delivered by Edward to his attorney in Los Olivos the very same day. His attorney called Rosemary's attorney in Los Angeles and informed him of the agreement. Rosemary's attorney was surprised and somewhat chagrined by this development.

On July 25, 1975, Edward left the ranch and deposited his personal belongings with relatives in Sunland. There was testimony that he had expressed his relief and satisfaction with the fact that he and Rosemary had resolved their disputes.

On July 29, 1975, Edward suffered a fatal heart attack. After his death, it was discovered that he had executed a will on June 21, 1975, a month before the execution of the written agreement, leaving his entire estate to

the petitioners herein, his nephew and his nephew's wife. This will had been drafted by Edward's attorney in the dissolution proceedings. He testified at trial that Edward had declared that his purpose in making the new will was to keep his wife from getting any of his property in the event of his death.

At trial, Rosemary denied that the parties had intended their "thoughts," as she described the contents of the writing signed twice by her and her husband, Edward, to constitute a valid and enforceable agreement. She testified that, although she wrote the agreement, the terms were dictated by Edward. She said that she informed Edward as she wrote that the agreement was not to be effective until converted into an agreement by their lawyers.

## II

### The Trial Court's Decision

The trial court rejected Rosemary's assertion that she had been forced to execute the agreement, and also her assertion that the writing represented preliminary negotiations subject to the approval of the Geberts' lawyers. The court found that "the Respondent, Rosemary M. Gebert, was a woman who knew her own mind, who knew and understood what she wanted and what she was doing, and who desired and intended to settle the matters that were set forth in the agreement. . . . The parties intended to divide and separate their interests in the Glory Ranch and I.S.I. Trust Fund Account, and agreed to do so, as evidenced by the course of dealing between the parties prior to July 22, 1975, and the agreement of July 22, 1975, itself. . . ." Thus the agreement was found to be valid and enforceable.

The trial court reached a number of conclusions from its factual findings, including a conclusion that "[t]he Agreement of July 22, 1975, contained provisions inconsistent with the continuance of joint tenancy ownership in the Glory Ranch and in I.S.I. Trust Fund Account No. 1277358-N0020. . . . The Agreement of July 22, 1975, to sell and divide the proceeds of the Glory Ranch and I.S.I. account was wholly inconsistent with and interfered with the rights of survivorship, and negated any intention of the survivor to succeed to the other's interest in said property. . . . The legal effect of the aforesaid interference with the right of survivorship was to sever the joint tenancy ownership. . . ."

Thus, the court concluded that Edward and Rosemary had, before Edward's death, become tenants in common with respect to their interests in the subject property, and, as a result, Edward's share passed by his will to petitioners Joseph and Roni Gebert, rather than to Rosemary by operation of law if she had been a surviving joint tenant of joint tenancy property.

## III

### *The Contention on Appeal*

On this appeal, Rosemary does not attack the factual findings of the trial court despite her profound disagreement with those findings. She contends that the written agreement cannot be construed to support the legal conclusion that the parties intended thereby to terminate their joint tenancy holdings and convert them into tenancy in common holdings.

## IV

### *Does the Execution by Joint Tenants of an Agreement to Sell the Property in the Future and Divide the Proceeds Equally Constitute a Termination of the Joint Tenancy?*

Contrary to the contention of Rosemary, the surviving widow, it is the position of petitioners, as beneficiaries of Edward's will, that the handwritten agreement, executed by Edward and Rosemary Gebert, expressed their intention to terminate their joint tenancy holdings upon *execution* of the agreement, with the result that they became tenants in common of the ranch and the I.S.I. securities; that as a tenant in common, Edward was free to dispose of his interest as he saw fit; that he did so by executing a will naming the petitioners as the objects of his bounty.

It is generally recognized that a joint tenancy consists of an estate owned jointly in undivided equal shares by two or more persons. (Civ. Code, § 683.) At common law, four "unities" were essential to the creation of a joint tenancy—the unities of interest, title, time and possession. "Although California law still requires these same four unities, [they] have been modified substantially from the original common-law concepts." (2 Miller & Starr, Cal. Real Estate (rev. 1977) § 13:15, pp. 466, 467.)

■    The principal characteristic of joint tenancy property ownership is the right of survivorship which accrues to a surviving joint tenant; the surviving joint tenant succeeds to the interest of the deceased joint tenant by operation of law. A termination of the joint tenancy, prior to the death of one joint tenant, by converting title to another form such as tenancy in common, destroys this right of survivorship.

The decisional law has recognized various ways in which a joint tenancy may be terminated with the consequent destruction of the right of survivorship. Our review of the decisional law concerning joint tenancy severance supports the conclusion that a major distinction is made between cases in which a joint tenant acts unilaterally with respect to the subject property (short of conveying away his interest), often without the knowledge of the other, and cases in which the action with respect to the subject joint tenancy property involves both or all the joint tenants. In the first situation, the unilateral action (short of conveying away his interest) does not sever the joint tenancy ordinarily, while in the second situation, the combined action of the joint tenants may have that effect.

The issue before us involves the question of what joint action by joint tenants is deemed sufficient to terminate joint tenancy ownership. This question was touched upon tangentially by the Supreme Court in *Tenhet v. Boswell* (1976) 18 Cal.3d 150 [133 Cal.Rptr. 10, 554 P.2d 330]. There, the court undertook the task of determining whether the action of one joint tenant in executing a long-term lease of joint tenancy property was so inconsistent with joint tenancy ownership that it severed the joint tenancy relationship. The court concluded that the joint tenancy there had not been terminated.

The *Tenhet* court made the observation that "a joint tenant's right of survivorship is an expectancy that is not irrevocably fixed upon the creation of the estate [citation]; it arises only upon success in the ultimate gamble—survival—and then only if the unity of the estate has not theretofore been destroyed by voluntary conveyance [citation], by partition proceedings [citations], by involuntary alienation under an execution [citations], *or by any other action which operates to sever the joint tenancy.*" (*Id.*, at pp. 155-156.) (Italics added.)

The *Tenhet* court did not specify the nature of "*other action*" which would have the effect of severing a joint tenancy, although the opinion declared that "we decline to find a severance in circumstances which do not clearly and unambiguously establish that either of the joint tenants desired to terminate the estate." (*Tenhet, supra,* 18 Cal.3d 150, 158.)

It is obvious that "other action which operates to sever the joint tenancy" (*Tenhet, supra,* 18 Cal.3d 150, 156) may involve action by all joint tenants. One such action to convert a joint tenancy into a tenancy in common is "by written mutual agreement." (*Id.,* at p. 158.) *Tenhet* seems to indicate that the action necessary to terminate a joint tenancy— whether by joint action of joint tenants or by only one of the joint tenants—must constitute an act which is "clearly indicative of an intent to terminate" the joint tenancy. (*Id.,* at p. 158.)

When does a written mutual agreement between joint tenants evince an unequivocal intent to terminate the joint tenancy? In *Smith v. Morton* (1972) 29 Cal.App.3d 616 [106 Cal.Rptr. 52], it was held that a written contract between joint tenants for the sale by one and purchase by the other of the seller's interest terminates the joint tenancy even though the contract is not performed prior to the death of one of the joint tenants. The sale and purchase contract in *Smith* was described by the *Tenhet* court as a conversion of a joint tenancy into a tenancy in common by "written mutual agreement." (*Tenhet, supra,* 18 Cal.3d 150, 158.)

In the case at bench, the written agreement between joint tenants is for the sale of the property to a third person—not to one of the joint tenants. Rosemary contends that an agreement between joint tenants to sell the property to a third person is *not* an act which is "clearly indicative of an intent to terminate" the joint tenancy as required by *Tenhet.* Rosemary relies upon *County of Fresno v. Kahn* (1962) 207 Cal.App.2d 213 [24 Cal.Rptr. 394], for her assertion that, without more, an agreement between joint tenants to sell to a third person is insufficient to constitute a termination of the joint tenancy.

In the *County of Fresno* case, all joint tenants executed a conditional contract of sale of the property to third parties which gave the purchasers possession. But the joint tenant sellers retained, on a united basis, the right to possession in the event of default by the purchasers. This contract of sale was held to be insufficient to sever the joint tenancy. The court emphasized that "[t]here was unity of right of repossession in the event of default, and in the absence of proof of a contrary intent it is to be assumed that the sellers intended, in view of the contingent nature of the contract, to maintain their status quo with respect to unity of possession, as joint tenants." (*County of Fresno, supra,* 207 Cal.App.2d 213, 217.)

*County of Fresno* is clearly distinguishable from the instant case. Rosemary's and Edward's agreement to sell reserved no similar unified

rights to possession as did the joint-tenant sellers in the *County of Fresno* case.

Petitioners Joseph and Roni rely primarily upon *Wardlow* v. *Pozzi* (1959) 170 Cal.App.2d 208 [338 P.2d 564], for their position that an agreement between joint tenants to sell the property to a third person, constitutes an unequivocal intent to terminate the joint tenancy and, hence, does in fact result in a termination. In *Wardlow,* the court was reviewing a pleading determination—a demurrer sustained without leave to amend. There, a husband and wife held property in joint tenancy and entered into a formal property settlement agreement setting forth alternative dispositions of the subject property at the termination of a leasehold, i.e., either sale to a third party or the acquisition by one joint tenant of the other's interest. The *Wardlow* court reversed the trial court's holding and remanded the action for fact finding on the question of the parties' intent—whether the parties intended their agreement to constitute an unequivocal termination of the joint tenancy.

*Wardlow,* therefore, is not dispositive of the instant case since the actual holding of *Wardlow* does not determine that the agreement between the spousal joint tenants constituted a severance of the joint tenancy but, rather, that the agreement created an ambiguity which could be resolved by the introduction of extrinsic evidence concerning the true meaning and intent of the parties to the agreement.

But *Wardlow* is significant in its observation that the spousal agreement was capable of being interpreted to the effect that "the right of either party to insist upon a sale, whether to one or the other or to a third person, was wholly inconsistent with the continuance of the joint tenancy relationship. Likewise such a provision would appear to negate any intent of the survivor to succeed to the other's interest." (*Wardlow, supra,* 170 Cal.App.2d 208, 211.)

Respondent Rosemary contends that, in the absence of express language of severance in the agreement before us, we cannot write a contract for the parties containing terms to which they never agreed. Rosemary cites no authority for this principle of contract interpretation—that particular language must be used by the contracting joint tenants to indicate their unequivocal intent to effectuate a termination of the joint tenancy and a conversion of the title into tenancy in common. Respondent Rosemary emphasizes that the actual language of the agreement contemplates a *future* sale of the ranch and a future

termination of the securities account which, she argues, is inconsistent with an intention to sever the joint tenancy upon *execution* of the informal settlement agreement. It is our view in the case before us, that whether the agreement is framed in the present or future tense is not of substantial materiality. What is of more importance is the *context* in which the agreement was made, the surrounding circumstances at the time, and the bargaining by equals with respect to the dissolution of their marital status. The record before us indicates that the parties at trial introduced extrinsic evidence regarding the meaning and interpretation which the parties intended to be given their agreement. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785].)

The trial judge was not required to believe Rosemary's testimony regarding the circumstances under which she and Edward entered into the agreement in question. The evidence before the trial court was clearly sufficient to support the trial court's concept of the agreement—that it represented the expressed intention of Rosemary and Edward to settle their property differences. It is inconceivable that they were bargaining with a view toward retaining their rights of survivorship until the property was sold and the proceeds received and divided equally between them. On the contrary, it is clear that, by their agreement to sell the ranch, they intended then and there, unequivocally, to terminate the joint tenancy and right of survivorship. We conclude, therefore, that the trial court correctly found that the execution of the agreement itself effected a change from joint tenancy to tenancy in common. This finding is consistent with the principles set forth in *Tenhet.* The trial court's judgment properly awarded a one-half interest in the subject properties to petitioners.

The judgment is affirmed.

Kingsley, Acting P. J., and Alarcon, J., concurred.